Andrew I. Silfen
George P. Angelich
Jordana L. Renert
ARENT FOX LLP
1301 Avenue of the Americas, Floor 42
New York, NY  10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email: andrew.silfen@arentfox.com
        george.angelich@arentfox.com
        jordana.renert@arentfox.com

*Counsel for 6060 Armor Road, LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | )    Chapter 11 |
| | ) |
| | )    Case No. 19-76260 (AST) |
| In re: | )    Case No. 19-76263 (AST) |
| | )    Case No. 19-76267 (AST) |
| Absolut Facilities Management, LLC, *et al.*, | )    Case No. 19-76268 (AST) |
| | )    Case No. 19-76269 (AST) |
| Debtors. [1] | )    Case No. 19-76270 (AST) |
| | )    Case No. 19-76271 (AST) |
| | )    Case No. 19-76272 (AST) |
| | ) |
| | )    (Jointly Administered) |
| | ) |
| 6060 ARMOR ROAD, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Adversary Proceeding No. _____ |
| | ) |
| ABSOLUT FACILITIES MANAGEMENT, LLC | ) |
| and ABSOLUT CENTER FOR NURSING AND | ) |
| REHABILITATION AT ORCHARD PARK, LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924) (collectively, the "Debtors").

AFDOCS/20973032.2

## COMPLAINT FOR DECLARATORY, EQUITABLE, AND INJUNCTIVE RELIEF

## INTRODUCTORY STATEMENT

6060 Armor Road, LLC ("Landlord") brings this Complaint for Declaratory, Equitable, and Injunctive Relief against Debtors Absolut Facilities Management, LLC ("AFM") and Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC ("AOP" or together with AFM, the "Orchard Park Debtors"), in connection with their premature and unauthorized efforts to close the skilled nursing facility located at 6060 Armor Road, Orchard Park, New York ("Orchard Park"). Specifically, Landlord seeks a declaration that 11 U.S.C. § 363(b) requires the Orchard Park Debtors to obtain Bankruptcy Court approval prior to implementing the closure of Orchard Park. Landlord also seeks equitable relief in the form of specific performance of postpetition obligations under its unrejected lease, which does not permit AOP to voluntarily cease operations or commit a waste of Orchard Park.

Although the Orchard Park Debtors recently filed a motion for *post hoc* Bankruptcy Court approval of their actions, they nonetheless continue to move forward with the rapid implementation of the closure without waiting for such approval. The closure is causing immediate, ongoing, and irreparable harm to Landlord, the estate, and potentially other stakeholders. Yet, they continue to discharge patients at a frenetic pace with corresponding reductions to incoming revenue and the value of the facility as a going-concern asset. Multiple parties expressed interest in assuming the operation of Orchard Park. Discharging all patients and shutting down operations will likely chill any such sale. The Debtors are apparently uninterested in such a result, as their response to Landlord's efforts to locate a new operator was to assert that only Israel Sherman may operate Orchard Park or the other facilities. Thus, the Debtors appear to

2

have no interest in maximizing the value of the facilities and are instead content to both dissipate assets and incur substantial administrative expenses.

If the Orchard Park Debtors continue this course of action by discharging all patients, their motion for closure will be moot before the Court has an opportunity to issue a ruling. As a result, Landlord seeks an injunction under 11 U.S.C. § 105 and Fed. R. Bankr. P. 7065 requiring the Orchard Park Debtors to pause the closure process and discharge of patients unless and until they obtain Bankruptcy Court approval. Injunctive relief is necessary and appropriate here to end the Orchard Park Debtors' reckless crusade to devalue estate assets outside of the bankruptcy process. They have not provided any substantiation for the course of action they are pursuing, including any detailed disclosure of their closure plan, to the Court, Landlord, or other interested stakeholders. If they are permitted to continue on their current course outside of Bankruptcy Court oversight, the estate will be harmed not only with respect to Orchard Park but with respect to any subsequent extra-judicial wind-downs of the Debtors' facilities. Given the Debtors' allegedly precarious financial condition, they will not be able to compensate the estate for this loss in value.

## PARTIES

1.     The Landlord is a Delaware limited liability company with an address of 6300 Wilshire Blvd. #1800, Los Angeles, California.

2.     Debtor AFM is New York limited liability company with an address of 300 Gleed Avenue, East Aurora, New York.

3.     Debtor AOP is a New York limited liability company with an address of 6060 Armor Road, Orchard Park, New York.

AFDOCS/20973032.2

## JURISDICTION & VENUE

4.     This action is within the jurisdiction of this Court pursuant to 28 U.S.C. § 1334 and constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and/or (O).

5.     Venue properly lies in this District under the provision of 28 U.S.C. §1409(a).

6.     As Landlord is seeking declaratory, equitable, and injunctive relief, this matter is brought before the Court as an adversary proceeding pursuant to Fed. R. Bankr. P. 7001.

## FACTS

### A.  Relationship of the Parties.

7.     Landlord leases Orchard Park to AOP under an Operating Lease, as amended by that Second Amendment to Operating Lease dated March 27, 2018 (the "Lease").  A true and correct copy of the original Operating Lease is attached hereto as **Exhibit A**, and a true and correct copy of the Second Amendment is attached hereto as **Exhibit B**.  The Lease has not expired.

8.     Orchard Park is a skilled nursing facility with 202 patient beds.  Upon information and belief, as of June 2019, Orchard Park had approximately 176 patients occupying beds.

9.     Landlord also leases skilled nursing or assisted living facilities to the other Debtors in these Chapter 11 cases.  One such facility, Orchard Brooke, is an assisted living facility that is physically adjoined to Orchard Park.

10.     AFM purports to hold a 54% membership interest in AOP and the other Debtors. According to the Lease, AFM is AOP's managing member.  AFM signed the Lease on AOP's behalf.

11.     AOP has a monthly lease obligation of $270,131.55, as well as a monthly impound obligation of $55,296.82.  AOP did not make its monthly rent and impound payments in July, August, or September of 2019, creating arrears in excess of $975,000.  *See* Exh. B., p. 1.

AFDOCS/20973032.2

12.     The Lease provides that in the event of a termination of the Lease, AOP will cooperate with Armor Road and use best efforts to assist in the transfer of operations to a new operator. Exh. A, p. 59.

13.     As of the date hereof, the Debtors have not moved to assume or reject the Lease for Orchard Park.  Accordingly, the Lease remains in full force and effect.

14.     It is a requirement under the Orchard Park Lease that AOP shall, among other things, "continue to be validly licensed and Medicare and Medicaid certified to operate a skilled nursing facility in accordance with the applicable rules and regulations . . . and shall remain so certified and shall remain such a holder in connection with its operation of the Leased Premises as a licensed and Medicare and Medicaid certified skilled nursing facility . . . ."  Exh. A, p. 30.

15.     Relatedly, the Lease forbids AOP to "abandon, terminate, vacate or fail to renew any licenses, certifications, accreditation, certificates, approvals, permits, variances, waivers, provider agreements or any other authorization which relates to the operation of the . . . skilled nursing facility business . . . or in any way commit any act which will or may cause any such licenses, certifications, accreditation, certificates, approvals, permits, variances, waivers, provider agreements or other authorization to be revoked by any Governmental Authority or accrediting body . . . ." Exh. A, p. 31.  AOP's licenses are collateral for its obligations to Armor Road, as reflected in duly filed UCC-1 statements covering those licenses.

16.     The Lease also provides that AOP "shall not commit nor suffer to be committed any waste on the Leased Premises." Exh. A, p. 31.

17.     The Lease provides that in the event of a default under the Lease, "Landlord shall have the right to invoke any remedy permitted to Landlord at law, equity or otherwise." Exh. A, pp. 47-48.

AFDOCS/20973032.2

18.     Further, the Lease provides that in the event Landlord is required to commence a legal action "because of the breach of any covenant herein . . . Tenant shall pay to Landlord all expenses, including reasonable attorney fees, incurred therefor." Exh. A, p. 48.

**B.  The Debtors' Chapter 11 Filings.**

19.     In August 2019, the Debtors' landlords engaged in discussions with the Debtors regarding their substantial accruing payment defaults and the possibility of a new replacement operator. In court filings, the Debtors disclosed the details of those discussions and alleged that the landlords kept the Debtors in the dark regarding any progress with the replacement operator.

20.      In fact, the Debtors were well aware of the status of the new replacement operator following those discussions, as there were ongoing communications about the due diligence for weeks and as recently as the last ten days.  What the Debtors failed to mention was their demand during those discussions that the Debtors' landlords would need to pay $10,000,000 to the Debtors' owner and CEO, Israel Sherman, if the landlords wanted to avoid a bankruptcy filing and have any hope of retaining their buildings as going-concern skilled nursing facilities because it was his position that such a payment reflected the value of his interest in the facilities.

21.     Soon thereafter, on or about September 10, 2019, the Debtors filed their petitions under Chapter 11 of the Bankruptcy Code.  The next day, the Debtors filed the Declaration of Michael Wyse In Support of Debtors' Chapter 11 Petition and First Day Motions ("Wyse Declaration").

22.     The Wyse Declaration represented that the Debtors would seek to "emerge from bankruptcy, with all of their Senior Living Facilities intact, as a going concern."  In stark contravention to this representation, however, AOP had at that time already filed a voluntary closure plan for Orchard Park with the New York State Department of Health ("DOH").

AFDOCS/20973032.2

23.    The DOH subsequently approved a closure plan for Orchard Park.  The Debtors have not disclosed the closure plan itself or the material details of its implementation to the Court or to Landlord.

24.    Nonetheless, after receiving DOH approval but without seeking or receiving the approval of this Court, the Orchard Park Debtors began implementing the closure of Orchard Park.

25.    Landlord understands that the Orchard Park Debtors have discharged at least 60-70 patients and that, as a result, Orchard Park is at half-capacity at best (and likely worse).

26.     After learning of this conduct, Landlord asserted that the Orchard Park Debtors were required to obtain Court approval prior to implementing the closure of Orchard Park.

27.    The Orchard Park Debtors' disagreed with Landlord's assertion, but nonetheless filed a Motion for Entry of Order Approving the Debtors' Plan of Closure for Orchard Park Facility (the "Closure Motion").  Despite the fact that, by filing the Closure Motion and submitting to the § 363 process, the Debtors effectively admitted that Court approval was required, the Debtors continued to assert that Court approval was not required and, indeed, that they were continuing to implement the closure plan.

28.    In support of the Closure Motion, the Debtors relied on yet another vague affidavit from Michael Wyse, which failed to provide the details of the closure plan or any concrete financial information underlying the reasons for Orchard Park's closure.

29.    Landlord has repeatedly asked the Orchard Park Debtors whether they will agree to maintain the status quo and refrain from implementing the closure (including the discharge of patients) unless and until they obtain Court approval.  The Orchard Park Debtors have refused to confirm that they will so refrain.

AFDOCS/20973032.2

30.    The Debtors' rapid discharge of patients constitutes a waste of Orchard Park in contravention of the Lease.

31.    The Debtors' voluntary efforts to close Orchard Park constitute a default under the Lease.

32.    If AOP completes the closure of Orchard Park it will be required to surrender its license and Medicare/Medicaid certifications, which will constitute a default under the Lease.

### C. Irreparable Harm and the Public Interest.

33.    A skilled nursing facility's revenues derive from payments for the treatment of patients occupying beds at the facility.

34.    Thus, in order for a skilled nursing facility to maintain operations, pay expenses and achieve profitability, it is critical that the facility fill as many of its beds as possible.

35.    The Orchard Park Debtors are presently doing the opposite: they are discharging patients and not replacing them.  In so doing, the Orchard Park Debtors are cutting off a valuable revenue stream in excess of $18,000,000 per year that would otherwise be available to pay expenses and care for patients.  To the extent the Orchard Park Debtors are moving patients to other Debtor facilities, there is still a negative impact on revenue because those patients will be using beds that could otherwise be filled by new patients.  Further, to the extent the Debtors plan to employ hundreds of Orchard Park employees at other facilities, it is unclear how those facilities are going to finance the absorption of the associated costs.

36.    The Debtors' closure of Orchard Park and discharge of patients will decimate the value of Orchard Park as a going concern asset of the estate, as well as substantially diminish the value of the Debtors' other facilities.

AFDOCS/20973032.2

37.     Notably, Landlord believes that the closure of Orchard Park will negatively impact the value of Orchard Brooke in particular, because the value of having an adjoining skilled nursing and assisted living facilities is far greater than the sum of the parts individually.

38.     The loss of the licensure and certification would also constitute a waste of Orchard Park and raise nearly insurmountable difficulties in finding a new operator.  It is generally far more difficult for a new operator to secure regulatory approval for a new license for a defunct facility than it is to obtain a replacement license for an operating, already-licensed facility.  Relatedly, where there is a transfer of an operating facility, the existing Medicare/Medicaid provider agreements will generally attach automatically to the new operator (unless the operator requests otherwise).  These distinctions are critical because replacement operators will be looking for a streamlined process and predictable path to the assumption of operations.  The vast majority of operators will not be interested in starting from scratch with an empty building and no licensure, Medicare/Medicaid certification, or provider agreements.

39.     Given that the Debtors' facilities are still operating (including Orchard Park to some extent), the Debtors' landlords have been contacted by multiple parties expressing strong interest in a transaction to assume operations for Orchard Park and the other facilities.  Most of these parties are interested in assuming the operation of the all of the Debtors' facilities, provided those facilities are operating at the time of assumption.

40.     One such party has conducted substantial due diligence for more than one month and is very close to signing a Letter of Intent.  This potential operator is experienced and well-established in the industry in the State of New York.  The potential operator is licensed in New York and is presently operating skilled nursing facilities in New York.  Unfortunately, the actions

of AOP and AFM in rapidly discharging patients have already changed the trajectory of negotiations and have the potential to chill a transaction altogether.

41.     On September 21, 2019, the landlords were contacted by multiple other parties interested in transactions to assume the operation of Orchard Park and the other facilities.  Each party sought information about the number of patients presently occupying beds at Orchard Park and expressed concerns over the rapid discharge of patients and closure of the facility.

42.     Skilled nursing facility operators are generally interested in turn-key facilities with a robust patient census.  They are not interested in paying anywhere close to market rent for a defunct facility, given that they will have to start from scratch in filling over 200 patients beds— let alone hiring a new staff, potentially buying new equipment, and incurring the other start-up costs (such as licensure and certification) that might otherwise be avoided when acquiring a facility as a going concern.

43.     Simply put, every discharge of a patient reduces the value of Orchard Park both in terms of present cash flow and in terms of locating a replacement operator.  If the Orchard Park Debtors are permitted to discharge all their patients from Orchard Park and shut down the facility, any new operator will have to locate replacement patients for the entire facility.  It is unlikely that any disinterested party will be interested in assuming the lease and operation of the facility because it will mean completely starting over.  Operators typically are not interested in starting from scratch and are certainly not interested in doing so at a market rate of rent.

44.     Armor Road will suffer irreparable harm if the Orchard Park Debtors continue to implement the closure and discharge patients prior to a hearing on Court approval because any denial of the request for closure will be meaningless if they have already substantially consummated the closure by discharging all of the patients.  In other words, even if the Debtors'

AFDOCS/20973032.2

motion to close Orchard Park is denied, the damage will already be done:  Armor Road will be unable to pursue a transaction with a new replacement operator and will lose the value of Orchard Park as a going concern skilled nursing facility.

45.     The discharge of all of the patients from Orchard Park and closure of the facility would eliminate its value as a licensed going concern skilled nursing facility and leave Armor Road with an empty building with minimal value. That is textbook waste of a skilled nursing facility and a substantial asset in these Chapter 11 cases.

46.     Further, the Debtors have shown no indication whatsoever that they will be in a position to compensate Armor Road for the diminished value of Orchard Park or the other facilities affected by Orchard Park's closure.  The Debtors' financial disclosures in these Chapter 11 cases have thus far been grossly inadequate.  Landlord does not have information concerning how the closure plan will be financed or, relatedly, what condition Orchard Park will be left in once it is closed.  The Debtors have not even filed bankruptcy schedules or a statement of financial affairs. Thus, the Debtors have provided no information as to what other assets located at Orchard Park might be wasted by closure.

47.     In addition, Armor Road has a substantial mortgage with HUD of approximately $15,000,000 for Orchard Park.  AOP's closure of Orchard Park and loss of licensure is likely to cause a default under Armor Road's HUD agreements.  Armor Road also depends on a lease payment stream from the operation of Orchard Park to make its mortgage payments, the failure of which would also constitute a default under Armor Road's HUD agreements.  The prospect of multiples breaches by Armor Road of its agreements with HUD (as a result of AOP's conduct) has the capacity to cause irreparable harm to Armor Road—not only with respect to the Orchard Park mortgage but future business dealings as well.

AFDOCS/20973032.2

48.     Notwithstanding the mysteries surrounding the Debtors' financial picture, their reasons for expediting the closure of Orchard Park, and their plans (if any) for the remainder of their facilities, Landlord believes there is a realistic opportunity to maximize the value of the Debtors' assets through a transaction with a new operator that would allow all of the Debtors' facilities to continue operating on a going-concern basis.  This is not only the best result for the estate, but the best result for all community stakeholders—particularly patients who have an interest in not being uprooted from nursing facilities.  However, the opportunity to achieve this result is only realistic if the facilities actually continue to operate.

49.     The Debtors have already demonstrated their insincerity and cavalier attitude from the outset of this case by averring their intention to continue operating all of the facilities, notwithstanding their preexisting plan to close Orchard Park without any intention of involving the Bankruptcy Court in the process.[2]  If the Debtors are permitted to unilaterally close facilities and discharge all patients without obtaining Bankruptcy Court approval or even disclosing the details, the impact on the estate and other interested parties will be calamitous.

50.     The estate will forever lose the ability to maximize the value of these facilities. Moreover, the closure of skilled nursing facilities and the abrupt discharge of patients is highly disruptive to patients and their treatment and well-being, not to mention their loved ones and the communities that these facilities serve.

51.     For all of these reasons, Landlord seeks declaratory, equitable, and injunctive relief precluding the Orchard Park Debtors' from continuing their course of action of decimating the value of estate assets outside of the oversight of the Bankruptcy Court and creditors.

---

[2] *See* Declaration of Michael Wyse in Support of Debtors' Chapter 11 Petition and First Day Motions [Docket No. 15] (the "First Day Declaration").

## COUNT I
### (Declaratory Judgment)

52.     Landlord repeats and incorporates herein by reference paragraphs 1 through 51 of this Complaint.

53.     Pursuant to 11 U.S.C. § 363(b), the Orchard Park Debtors, "after notice and a hearing, may use . . . other than in the ordinary course of business, property of the estate."

54.     The Orchard Park Debtors' ordinary course of business is the operation of a skilled nursing facility.

55.     Closing the skilled nursing facility is not in the ordinary course of the Orchard Park Debtors' business.  In fact, it is the opposite.

56.     Accordingly, pursuant to 11 U.S.C. § 363(b), the Orchard Park Debtors may only close Orchard Park with Court approval after notice and a hearing.

57.     The Orchard Park Debtors have denied that they are required to seek Court approval to close Orchard Park and have commenced the closure process without such approval.

58.     Although the Debtors filed the Closure Motion, effectively admitting that they are required to obtain Court approval through the § 363 process, they are proceeding as if they do not need Court approval of that motion in order to implement the closure plan.  Indeed, in the Closure Motion itself, the Debtors averred that they "do not believe Court approval is necessary to implement the Closure Plan" and "have been implementing the Closure Plan."   This implementation includes the discharge of at least 60 to 70 patients from Orchard Park.

59.     Further, Landlord opposes the allowance of the Closure Motion.

60.     In view of the foregoing, there is an actual controversy as to whether the Debtors are required to refrain from implementing the closure plan and discharge of patients thereunder until such time as the Bankruptcy Court approves the closure plan.

61.     Relatedly, there is an actual controversy as to whether the Debtors should be permitted to close Orchard Park.

62.     Accordingly, Landlord seeks a judgment, pursuant to 28 U.S.C. §§ 2201-2202 declaring that the Orchard Park Debtors may not implement the closure plan and discharge of patients thereunder until they have obtained Court approval pursuant to 11 U.S.C. § 363(b).

63.      Because the Orchard Park Debtors have not received such Court approval, Landlord also seeks a judgment declaring that the Orchard Park Debtors are not presently authorized to implement the closure plan or the discharge of patients thereunder.

## COUNT II
### (Specific Performance of Postpetition Obligations)

64.     Landlord repeats and incorporates herein by reference paragraphs 1 through 63 of this Complaint.

65.     Landlord and AOP are parties to the Lease, which is a lease of nonresidential real property.

66.     Landlord has fully performed its obligations under the Lease and remains ready, willing, and able to continue to full those obligations.

67.     The Lease has not expired.

68.     The Lease has not been assumed or rejected.

69.     Pursuant to 11 U.S.C. § 365(d)(3), AOP is required to "timely perform all obligations . . . arising from and after the order for relief" under the Lease (except those specified in § 365(b)(2)), until the Lease is assumed or rejected.

70.     AFM is AOP's managing member and signed the Lease on AOP's behalf. Therefore, AFM is likewise bound by § 365(d)(3) to the extent it controls AOP or acts on its behalf.

14

71.     The Lease prohibits AOP from committing waste of Orchard Park or allowing AFM to commit waste of Orchard Park.

72.     It is a default under the Lease for AOP to voluntarily cease operating Orchard Park.

73.     The Orchard Park Debtors are violating the Lease and § 365(d)(3) by closing Orchard Park and rapidly discharging the patients, which constitutes waste.

74.     For the reasons described above, Landlord will not have an adequate remedy at law against the Orchard Park Debtors if they close Orchard Park and discharge all the patients.

75.     Accordingly, the Debtors seek equitable relief in the form of an order of specific performance of the postpetition Lease obligations of the Orchard Park Debtors to, among other things, operate Orchard Park, not commit waste, and maintain licensure and certifications.

## COUNT III
### (Injunctive Relief)

76.     Landlord repeats and incorporates herein by reference paragraphs 1 through 75 of this Complaint.

77.     Landlord is likely to succeed on the merits of its claim that the Debtors must obtain bankruptcy court approval prior to implementing the closure of Orchard Park.

78.     Further, AOP agreed in the Lease that Landlord would be entitled to invoke any equitable or other relief to enforce the terms of the Lease.

79.     Landlord will be irreparably harmed if the Orchard Park Debtors close Orchard Park and discharge all the patients prior to the Court ruling on the Closure Motion.  If the Closure Motion is denied, but the patients have all been discharged, the denial of the Closure Motion will be meaningless because the damage will be done.  Landlord will be unable to pursue a transaction with a replacement operator for Orchard Park as a licensed skilled nursing facility as a going concern.  Instead, Landlord will be left with an empty building of minimal value.

AFDOCS/20973032.2

80.     Landlord is aware of no material harm that the Orchard Park Debtors will suffer if Orchard Park remains open until such time as the Court rules on the Closure Motion.  To the contrary, the Orchard Park Debtors will be benefited by the continued ability to receive revenue from and maximize the value of Orchard Park.

81.     The public interest, including the interests of the estate, patients, employees, and other community stakeholders, favors an injunction against the closure of Orchard Park.

82.     Accordingly, Landlord is seeking preliminary injunctive relief, including the issuance of a temporary restraining order to maintain the status quo until such time as the Court issues a ruling on the Closure Motion.

83.     Landlord also seeks a judgment, pursuant to Fed. R. Civ. P. 7065 and 11 U.S.C. § 105, enjoining the Debtors from closing Orchard Park.

**PRAYER FOR RELIEF**

**WHEREFORE**, Landlord respectfully requests that the Court:

a)     Enter Judgment in favor of Landlord and against the Orchard Park Debtors on all counts of Landlord's Complaint;

b)     Enter Judgment on Count I declaring that the Orchard Park Debtors are required to obtain Court approval prior to implementing the closure and discharge of patients of Orchard Park and are prohibited from implementing such closure until Court approval is obtained;

c)     Enter Judgment on Count II ordering the Orchard Park Debtors to specifically perform the postpetition obligations of the Lease until such time as the Lease is rejected, including but not limited to the obligation to operate Orchard Park, not commit waste, and maintain licensure and certifications;

d)      Enter Judgment on Count III preliminarily and permanently enjoining the Orchard Park Debtors from implementing the closure and discharge of patients of Orchard Park without Court approval;

e)      Award Landlord its expenses, costs, and reasonable attorneys' fees; and

f)      Grant such other and further relief that the Court deems just and proper.

Dated:   New York, New York
         September 23, 2019

ARENT FOX LLP

*Counsel for 6060 Armor Road, LLC*

By:   */s/ George P. Angelich*
      Andrew I. Silfen
      George P. Angelich
      Jordana L. Renert
      1301 Avenue of the Americas, Floor 42
      New York, New York 10019
      Telephone: (212) 484-3900
      Facsimile: (212) 484-3990
      Email: andrew.silfen@arentfox.com
             george.angelich@arentfox.com
             jordana.renert@arentfox.com

AFDOCS/20973032.2