**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>Absolut Facilities Management, LLC, *et al.*,<br><br>Debtors.¹ | Chapter 11<br><br>Case No. 19-76260 (AST)<br>Case No. 19-76263 (AST)<br>Case No. 19-76267 (AST)<br>Case No. 19-76268 (AST)<br>Case No. 19-76269 (AST)<br>Case No. 19-76270 (AST)<br>Case No. 19-76271 (AST)<br>Case No. 19-76272 (AST)<br><br>(Jointly Administered) |
| 6060 ARMOR ROAD, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ABSOLUT FACILITIES MANAGEMENT, LLC<br>and ABSOLUT CENTER FOR NURSING AND<br>REHABILITATION AT ORCHARD PARK, LLC<br><br>Defendants. | Adversary Proceeding No. 19-08121 |

## AFFIDAVIT OF IRA SMEDRA

I, Ira Smedra, on oath, do hereby depose and say as follows:

1.     I am the President of Arba Group, Inc. (the "Arba Group"). The Arba Group

provides administrative management services and leasing arrangements for skilled nursing

facilities and assisted living facilities, and leases through its affiliated entities each of the

facilities operated by the Debtors in these Chapter 11 cases.

---

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924) (collectively, the "Debtors").

2.     I make the statements in this affidavit based on my own personal knowledge except as to those stated in this affidavit as being based on my belief or understanding.  With respect to the latter, I believe them to be true and accurate.

3.     I have been in the nursing home business since 1969 and have decades of experience in the field of leasing skilled nursing facilities and assisted living facilities.  Over the years, I participated in the leasing of hundreds of facilities to skilled nursing operators.  Through these experiences, I developed substantial expertise and an in-depth understanding of the skilled nursing leasing business, including the ability to assess the value of a particular skilled nursing facility and the factors driving that value.

4.     Through my role as President of the Arba Group, I have specific knowledge regarding the Debtors' leasing relationships with various affiliates of the Arba Group.

5.     The Debtors lease seven facilities from affiliates of the Arba Group: six skilled nursing facilities and one assist living facility.

6.     One of Arba Group's affiliates, 6060 Armor Road, LLC ("Armor Road"), leases a skilled nursing facility located at 6060 Armor Road, Orchard Park, New York ("Orchard Park"), to one of the Debtors, Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC ("AOP").

7.     The terms of the leasing relationship between Armor Road and AOP are set forth in an Operating Lease, as amended by that Second Amendment to Operating Lease dated March 27, 2018 (the "Lease").  True and accurate copies of the Lease and the Second Amendment are attached to the Complaint as Exhibits A and B, respectively.  I signed the Lease on behalf of Armor Road's managing entity.  Debtor Absolut Facilities Management, LLC ("AFM") signed the Lease on behalf of AOP as its managing member.  The Lease has not expired.

2

8.     Orchard Park is a skilled nursing facility with 202 patient beds.  Based on a patient census received from the Debtors, I understand that Orchard Park had approximately 176 patients occupying beds as of June 2019.  I understand that AOP has historically generated annual revenue in excess of $18,000,000 per year from the operation of Orchard Park.

9.     In addition, Armor Road leases an adjoining assisted living facility, Orchard Brooke, to Debtor Absolut at Orchard Brooke, LLC.  There is access between the Orchard Brooke assisted living facility and the Orchard Park skilled nursing facility.  As a result, based on my experience, the facilities together hold a significantly higher going concern value to a potential operator than each would otherwise hold separately.

10.     It is a requirement under the Orchard Park Lease that AOP shall, among other things, "continue to be validly licensed and Medicare and Medicaid certified to operate a skilled nursing facility in accordance with the applicable rules and regulations . . . and shall remain so certified and shall remain such a holder in connection with its operation of the Leased Premises as a licensed and Medicare and Medicaid certified skilled nursing facility . . . ."  Lease, p. 30.

11.     Relatedly, the Lease forbids AOP to "abandon, terminate, vacate or fail to renew any licenses, certifications, accreditation, certificates, approvals, permits, variances, waivers, provider agreements or any other authorization which relates to the operation of the . . . skilled nursing facility business . . . or in any way commit any act which will or may cause any such licenses, certifications, accreditation, certificates, approvals, permits, variances, waivers, provider agreements or other authorization to be revoked by any Governmental Authority or accrediting body . . . ." Lease, p. 31.  AOP's licenses are collateral for its obligations to Armor Road, as reflected in duly filed UCC-1 statements covering those licenses.

3

12.     The Lease also provides that AOP "shall not commit nor suffer to be committed any waste on the Leased Premises." Lease, p. 31.

13.     It is also a default under the Lease for AOP to voluntarily "cease[] operations of the Facility." Lease, p. 43.

14.     The Lease also provides that in the event of a termination of the Lease, AOP will cooperate with Armor Road and use best efforts to assist in the transfer of operations to a new operator. Lease, p. 59.

15.     AOP has a monthly lease obligation of $270,131.55, as well as a monthly impound obligation of $55,296.82.  AOP did not make its monthly rent and impound payments in July, August, or September of 2019, creating arrears in excess of $975,000.

16.     In August 2019, the Arba Group and the affiliated landlords of the Debtors engaged in discussions with the Debtors regarding their substantial accruing payment defaults and the possibility of a new replacement operator.  I understand that in a recent filing the Debtors disclosed the details of those discussions, including a quotation attributed to me.  In fact, the Debtors were well aware of the status of the new replacement operator following that meeting, as there were ongoing communications about the due diligence for weeks and as recently as the last ten days.  What the Debtors failed to mention was their demand during those discussions that the Debtors' landlords would need to pay $10,000,000 to the Debtors' owner and CEO, Israel Sherman, if the landlords wanted to avoid a bankruptcy filing and have any hope of retaining their buildings as going-concern skilled nursing facilities because it was his position that such a payment reflected the value of his interest in the facilities.

17.     I understand that shortly thereafter, on or about September 10, 2019, the Debtors filed petitions under Chapter 11 of the Bankruptcy Code.

4

Case 8-19-08121-ast    Doc 2    Filed 09/23/19    Entered 09/23/19 15:30:19

18.    I also understand that the Debtors have not rejected their leases with the Arba Group affiliates, including the Orchard Park Lease.  As a result, AOP and AFM (as its managing member) are required to comply with the terms of the Lease.  They have not done so.

19.    I was informed that AOP and AFM are implementing a closure plan for Orchard Park.  I have not seen this closure plan and I am unaware of its terms.  Further, I do not believe that AOP or AFM have provided the plan or its terms to anyone else associated with Armor Road or the Arba Group.

20.    Nonetheless, I learned that since entering bankruptcy AOP and AFM have discharged approximately 60-70 patients from Orchard Park.  I understand that Orchard Park is not currently accepting new patients.  As a result, Orchard Park is likely at half-capacity at best (but likely worse).

21.    By virtue of this conduct, AOP is in default of its obligation under the Lease to not voluntarily cease operating Orchard Park.

22.    The mass discharge of patients is also a violation of AOP's covenant not to waste or permit the waste of Orchard Park.  A skilled nursing facility's revenue derives from payments for the treatment of patients occupying beds at the facility.  Thus, in order for a skilled nursing facility to maintain operations, pay expenses and achieve profitability, it is critical that the facility fill as many of its beds as possible.

23.    AOP and AFM are presently doing the opposite: they are discharging patients and not replacing them.  In so doing, the Orchard Park Debtors are cutting off a valuable revenue stream historically in excess of $18,000,000 per year that would otherwise be available to pay expenses and treat patients.  To the extent they are moving patients to other Debtor facilities, there is still a negative impact on the Debtors' revenue because those patients will be using beds

that could otherwise be filled by new patients.  Further, to the extent the Debtors plan to employ the hundreds of Orchard Park employees at other facilities, it is unclear how those facilities are going to finance the absorption of the associated costs of the new employees.

24.     In addition, I believe the closure of Orchard Park and discharge of patients will decimate the value of Orchard Park, as well as substantially diminish the value of the Debtors' other facilities, as going-concern assets.  As alluded to above, the closure of Orchard Park will negatively impact the value of Orchard Brooke in particular, because the value of having an adjoining skilled nursing and assisted living facilities is far greater than the sum of the parts individually.

25.     Further, if AOP completes the closure of Orchard Park it will be required to surrender its license and Medicare/Medicaid certifications in violation of the Lease. The loss of the licensure and certification would also constitute a waste of Orchard Park and raise nearly insurmountable difficulties in finding a new operator.

26.     In my experience, it is far more difficult for a new operator to secure regulatory approval for a new license for a defunct facility than it is to obtain a replacement license for an operating, already-licensed facility.  Relatedly, where there is a transfer of an operating facility, the existing Medicare/Medicaid provider agreements will generally attach automatically to the new operator (unless the operator requests otherwise).  These distinctions are critical because replacement operators will be looking for a streamlined process and predictable path to the assumption of operations.  The vast majority of operators will not be interested in starting from scratch with an empty building and no licensure, Medicare/Medicaid certification, or provider agreements.

AFDOCS/20973517.2

27.     Given that the Debtors' facilities are still operating (including Orchard Park to some extent), I have been contacted by multiple parties expressing strong interest in a transaction to assume operations for Orchard Park and the other facilities.  Most of these parties are interested in assuming the operation of the all of the Debtors' facilities, provided those facilities are operating at the time of assumption.

28.     One such party has conducted substantial due diligence for more than one month and is very close to signing a Letter of Intent.  This potential operator is experienced and well-established in the industry in the State of New York.  The potential operator is licensed in New York and is presently operating skilled nursing facilities in New York.  Unfortunately, the actions of AOP and AFM in rapidly discharging patients has already changed the trajectory of negotiations and has the potential to chill a transaction altogether.

29.     On September 21, 2019, I was contacted by multiple other parties interested in transactions to assume the operation of Orchard Park and the other facilities.  Each party sought information about the number of patients presently occupying beds at Orchard Park and expressed concerns over the rapid discharge of patients and the closure of the facility.

30.     As indicated above, my experience has been that skilled nursing facility operators are interested in turn-key facilities with a robust patient census.  They are not interested in paying anywhere close to market rent for a defunct facility, given that they will have to start from scratch in filling over 200 patients beds—let alone hiring a new staff, possibly buying new equipment, and incurring other start-up costs (such as licensure and certification) that might otherwise be avoided when acquiring a facility as a going concern.

31.     In my view, supported by decades of experience, every discharge of a patient reduces the value of Orchard Park both in terms of present cash flow and in terms of locating a

replacement operator.  The discharge of all of the patients from Orchard Park and closure of the facility would eliminate its value as a licensed going concern skilled nursing facility and leave Armor Road with an empty building with minimal value.  That is textbook waste of a skilled nursing facility and a substantial asset in these Chapter 11 cases.

32.    Armor Road will suffer irreparable harm if AOP continues to implement the closure and discharge patients prior to a hearing on Court approval because any denial of the request for closure will be meaningless if AOP has already substantially consummated the closure by discharging all of the patients.  In other words, even if the Debtors' motion to close Orchard Park is denied, the damage will already be done: Armor Road will be unable to pursue a transaction with a new replacement operator and will lose the value of Orchard Park as a going concern skilled nursing facility.  Further, the Debtors have shown no indication whatsoever that they will be in a position to compensate Armor Road for the diminished value of Orchard Park or the other facilities affected by Orchard Park's closure.

33.    In addition, Armor Road has a substantial mortgage with HUD of approximately $15,000,000 for Orchard Park.  AOP's closure of Orchard Park and loss of licensure is likely to cause a default under Armor Road's HUD agreements.  Armor Road also depends on a lease payment stream from the operation of Orchard Park to make its mortgage payments, the failure of which would also constitute a default under Armor Road's HUD agreements.  The prospect of multiples breaches by Armor Road of its agreements with HUD (as a result of AOP's conduct) has the capacity to cause irreparable harm to Armor Road—not only with respect to the Orchard Park mortgage but future business dealings as well.

34.    Notwithstanding the above, I continue to believe there is a realistic opportunity to maximize the value of the Debtors' assets through a transaction with a new operator that would

8

allow all of the Debtors' facilities to continue operating on a going-concern basis. This opportunity is only realistic if the facilities actually continue to operate—and the more facilities that are operating, the more interest there will be among qualified replacement operators.

35.     If the Debtors are permitted to unilaterally close facilities and discharge all the patients without obtaining Court approval or even disclosing the details, the impact on creditors, including but not limited to Armor Road, employees, patients, and other interested parties, will be calamitous.

36.     Creditors will forever lose the ability to maximize the value of these facilities. Moreover, in my experience over the years, the closing of skilled nursing facilities and the abrupt discharge of patients is highly disruptive to patients and their treatment and well-being, their loved ones, and the communities that these facilities serve.  I cannot understand why the Debtors insist on pursuing such a path, particularly where there are viable alternatives that will result in better outcomes for everyone.

37.     At a minimum, I believe that the Bankruptcy Court, Armor Road, other creditors, employees, patients, and community stakeholders should have a voice in the process, as well as access to the Debtors' plans and the underlying business information upon which those plans are allegedly based.  To my knowledge, this has not happened to date.

38.     For all of these reasons, I believe it is in the best interests of all stakeholders to maintain the status quo of Orchard Park as an operating facility and to cease the current pace of patient discharges until all stakeholders have had the opportunity to be heard at a hearing and, even then, only if the Court approves the Debtors' closure plan.  We look forward to the opportunity to have such a hearing and hope the Court will see the merits of denying the Debtors' motion for closure.

I declare under the penalties of perjury that the foregoing is true and correct.  Executed on the 23rd day of September, 2019.

Ira Smedra

10